IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| PALEKAIKO BEACHBOYS CLUB, INC., a 501(c)(4) organization, THOMAS JOHN COPP, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>CITY AND COUNTY OF HONOLULU,<br><br>Defendants. | Civil No. 25-00304 MWJS-RT<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION TO DISMISS, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING BREACH OF CONTRACT CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION |

## INTRODUCTION

Plaintiffs Palekaiko Beachboys Club, Inc., and Thomas J. Copp once operated a nonprofit "beachboy" concession at Kūhiō Beach Park, a popular and historically significant beach park in the Waikīkī neighborhood of the City and County of Honolulu. But in recent years, the City has not authorized them to do so. And when Plaintiffs attempted to provide compensated services without authorization, the City imposed fines under its ordinances prohibiting unauthorized fee-generating activity— that is, peddling—at the beach park.

Lacking both permission and the ability to provide compensated services without it, Plaintiffs brought a federal lawsuit in 2021 in which they raised First Amendment, equal protection and due process challenges to the City's regulatory

framework for nonprofit beachboy concessions, as well as to the City's enforcement of its anti-peddling ordinances.  That lawsuit ended in a 2023 settlement agreement in which the parties agreed to broadly and globally resolve all claims that were or could have been brought.  Two years later, however, Plaintiffs—concerned that the City was not adequately implementing the settlement agreement—filed this action.  Plaintiffs now assert First Amendment, antitrust, and breach-of-contract claims.  The First Amendment claims are strikingly similar to the ones in their first federal lawsuit, while the antitrust claims could readily have been brought in that earlier suit.

The City has now moved for dismissal and alternatively for summary judgment, the latter principally on the theory that Plaintiffs' claims are barred by the settlement agreement.  Plaintiffs, meanwhile, have moved for summary judgment on the ground that the City has breached the settlement agreement.

Because the court agrees with the City that the settlement agreement precludes Plaintiffs' First Amendment and antitrust claims, it concludes that Plaintiffs lack standing to pursue those claims in federal court; the City's motion for summary judgment on those claims is therefore GRANTED.  The City's motion to dismiss those same claims is DENIED as moot.  And because the court concludes that it lacks subject matter jurisdiction over Plaintiff's remaining claim for breach of the settlement agreement, Plaintiffs' motion is DENIED and the breach-of-contract claim is DISMISSED.

These rulings do not leave Plaintiffs without a forum to litigate their contentions. Federal courts are courts of limited jurisdiction and may only resolve the merits of disputes when constitutional and statutory requirements are met. When, as here, those requirements are not satisfied, the parties remain free to press their claims in state court.

## BACKGROUND

In recounting the facts and procedural history of this case, the court accepts all facts in Plaintiffs' complaint—as well as any reasonable inferences to be drawn from them—as true and construes them in the light most favorable to Plaintiffs. It likewise credits all of Plaintiffs' evidence. *See Doe v. United States*, 419 F.3d 1058, 1062 (9th Cir. 2005) (motion to dismiss); *Soremekun v. Thrifty Payless, Inc.,* 509 F.3d 978, 984 (9th Cir. 2007) (summary judgment).

### A.    The Regulation of Beachboy Concessions at KBP

Kūhiō Beach Park (KBP) is a City-run public park located along Waikīkī Beach in Honolulu. To meet public demand for beach-related recreational services, the City authorizes a limited number of private operators—commonly referred to as "beachboys"—to provide fee-generating services within the park. These services include, among other things, surf instruction, outrigger canoe rides, and the rental of beach-related equipment. *See* Dkt. No. 12-1, at PageID.79–81.

But not just anyone is allowed to provide fee-generating services. Under the City's regulatory scheme, commercial activities of this sort may only be conducted at

KBP with a City-issued concession or permit. *Id.* That is to say, the City's anti-peddling ordinances prohibit commercial activity at KBP except by authorized concessionaires; individuals and organizations lacking a permit are not allowed to solicit customers or provide fee-based services in the park.

The City grants permits to two categories of beachboy concessions in Waikīkī: one is operated by a for-profit entity, while the other is reserved for a nonprofit beach service association. *Id.* at PageID.80. But while the for-profit concession operates under the competitive bidding requirements that apply to most City concessions, the nonprofit concession is exempt from those requirements. *Id.*

B.    **Palekaiko and its Beachboy Services**

One of the nonprofit organizations that has sought permission to operate a beachboy concession at KBP is Palekaiko, which Thomas J. Copp founded in 1994. Palekaiko seeks to "preserve and perpetuate the historical and cultural traditions of the Hawaiʻi beachboy." Dkt. No. 1, at PageID.4. Palekaiko provides "educational programs and services to residents and visitors in traditional Hawaiian water sports," specifically surfing and outrigger canoe. *Id.* And it seeks to access a section of KBP that has specific "cultural ties" to the Hawaiian beachboy tradition: "a section of Waikīkī Beach (fronting the Duke Kahanamoku statue at KBP) where two surf breaks (spots) favored by the ancient Hawaiians called Kapuni (now known as 'Canoes' and 'Queens') are located." *Id.* at PageID.9. These activities, Palekaiko and Copp explain, are not

4

merely commercial endeavors, but rather are forms of expressive and cultural conduct protected by the First Amendment.

For a time, things went smoothly for Palekaiko, as it was granted several City permits to operate its nonprofit beachboy stand between 1999 and 2005.  But since 2005, Palekaiko has been unable to secure any further award of the nonprofit concession at KBP.  *Id*. at PageID.4-5.  And when Copp has provided beachboy services without a permit, he has on multiple occasions been fined under the City's anti-peddling ordinances.  Palekaiko and Copp responded to these developments with a first federal lawsuit in 2021 (which they ultimately settled in 2023) and the present lawsuit filed in 2025.

### C.    The 2021 Lawsuit and 2023 Settlement

Plaintiffs' first federal lawsuit challenged the City's beachboy concession system for nonprofit concessions, as well as the enforcement of ordinances against those lacking a permit.  *See* 21-cv-500-DKW-KJM, Dkt. No. 1.  Their complaint initially asserted constitutional claims under the First Amendment to the U.S. Constitution and the right to free speech under the Constitution of Hawai'i.  *See id*. at ¶¶ 83-90.  It also raised claims under the Due Process Clause of the Fifth and Fourteenth Amendments to the U.S. Constitution, the Equal Protection Clause of the Fourteenth Amendment, and comparable protections in the Constitution of Hawai'i.  *Id*. at ¶¶ 91-95.

5

1.   In support of their First Amendment and free speech claims, Plaintiffs alleged that the City had "effectively shut Palekaiko and other nonprofit beachboys out of Kūhiō Beach Park."  *Id*. at ¶ 37.  They contended that the City had failed to issue a solicitation for the nonprofit beachboy concession for many years, *id*. at ¶¶ 79–80, and that the City instead relied on revocable permits issued "without any public notice or call for applicants," *id*. at ¶ 77.  Plaintiffs further alleged that the City had failed to promulgate administrative rules for the issuance of revocable permits, and that this lack of standards created a system "ripe for abuse and favoritism."  *Id*. at ¶ 41.  And Plaintiffs alleged that the City's practices amounted to an unconstitutional prior restraint on speech, in part because it granted the City "unfettered discretion on whether to authorize or deny a concession, permit or license for handbilling, peddling and solicitation at KBP."  *Id*. at ¶¶ 22, 41, 46.

As a separate First Amendment and free speech theory, Plaintiff Copp challenged citations he had received for "peddling without a permit" when offering surfboard rentals or accepting donations in connection with beachboy activities.  *Id*. at ¶¶ 81–82.  He alleged that these enforcement actions were selectively applied and disproportionately harmed nonprofit beachboys engaged in expressive and cultural activities, and that the enforcement of these ordinances chilled their free speech rights by making it impossible to engage in protected speech without risking citation or arrest. *Id*. at ¶¶ 83-85, 93–94.

6

In support of their due process and equal protection claims, Plaintiffs alleged that the City failed to follow its own ordinances and treated similarly situated nonprofit beachboy organizations differently.  *Id*. at ¶¶ 91–95.

As relief, Plaintiffs sought declaratory relief invalidating the challenged ordinances and practices, injunctive relief barring their enforcement, and orders requiring the City to permit Plaintiffs to engage in nonprofit beachboy activities at KBP.

2.   The City filed a motion to dismiss the lawsuit under Federal Rule of Civil Procedure 12(b)(6), contenting that Plaintiffs' claims were time-barred under the relevant statute of limitations, and that the complaint failed to state a claim under which relief could be granted.  21-cv-00500-DKW-KJM, Dkt. No. 10-1, at PageID.50-51. The City argued that it properly regulated what it characterized as Palekaiko's "commercial" speech.  *Id*. at PageID.55.  As to Palekaiko's equal protection claims, the City denied any disparate treatment or unequal enforcement that would give rise to such a claim.  *Id*. at PageID.67-72.  Finally, the City opposed the due process claim on the basis that Palekaiko did not, at the time, have a contract and therefore lacked the sort of property right needed to bring such a claim.  *Id*. at PageID.72.

After further litigation—which included a court order granting in part and denying in part the City's motion, a grant of leave to amend, and an amended complaint and subsequent cross-motions for summary judgment—the parties opted in 2023 to resolve the case through a settlement agreement (the "Agreement").  Dkt. No.

91.  The Agreement included a broad release of all claims made in Plaintiffs' initial and amended complaints.  *See* 25-cv-304-MWJS-RT, Dkt. No. 3, at PageID.48.  By its terms—and with one notable exception discussed in more detail below—the Agreement was intended "to be a complete and final global settlement of all Claims, disputes, and obligations between [the parties] arising from and related to Plaintiffs' claims contained in the Lawsuit."  Dkt. No. 3, at PageID.48.

### D.    The 2025 Lawsuit

Palekaiko and Copp filed this action against the City in 2025, again alleging violations of their constitutional rights arising from the City's regulation of beachboy activity at KBP.  *See* 25-cv-00304-MWJS-RT, Dkt. No. 1.  They assert claims under the First Amendment, federal antitrust law, and state contract law.  *Id*. at PageID.35-40. And they contend that they have been "continually blocked from carrying out statutorily recognized cultural activities" at KBP.  *Id*. at PageID.2.  Plaintiffs do not challenge the validity of the Agreement, but rather allege that the City breached it.

1.  As in the prior lawsuit, Plaintiffs point to the City's regulatory scheme under which the City continues to regulate beachboy activity at KBP through a combination of concessions, revocable permits, and enforcement of park and peddling ordinances.  *Id*. at PageID.10-15.  As in 2021, Plaintiffs challenge both the City's regulatory scheme for awarding permits to nonprofit beachboy concession stands, as well as the anti-peddling ordinances that make it unlawful to engage in handbilling and solicitation without a

permit. *Id*. at PageID.12. And just as he did before, Copp also challenges the ordinances under which he has received more recent citations for peddling without a permit in connection with surfboard rentals, fundraising, or donation-based instruction; Plaintiffs allege that this enforcement history has chilled their activities at KBP. *Id*. at PageID.14-16.

Plaintiffs further allege that the City's regulatory framework—though modified following the Agreement—continues to vest City officials with broad discretion to determine whether to issue nonprofit concessions, permits, or licenses, and when to enforce the anti-peddling ordinances, and that the framework itself is contradictory. *Id*. at PageID.12, 26-27. And that is constitutionally impermissible, Plaintiffs contend, because nonprofit beachboy activities involve both expressive and commercial elements, and yet the ordinances are "overly broad" and permit selective enforcement. *Id*. at PageID.13. Plaintiffs therefore assert that the City's regulatory and enforcement scheme operates as an unconstitutional prior restraint on "fully protected" expressive activity, in violation of the First Amendment. *Id*. at PageID.12-14. Plaintiffs also allege that the permitting scheme for nonprofit concessions results in "unfettered discretion" and favoritism toward a small number of entities, and also operates as a prior restraint "in violation of the First Amendment." *Id*. at PageID.17.

In addition to these First Amendment claims, Plaintiffs raise antitrust claims. They allege that although City ordinances contemplate nonprofit beachboy concessions,

the City has awarded only one such concession in the past two decades and has instead

relied on revocable permits.  *Id*. at PageID.16-17.  Through the use of its regulatory

authority, Plaintiffs contend, the City has essentially established a City monopoly over

commercial surfing lessons.  *Id*. at PageID.31.  And, Plaintiffs add, the regulations

requiring permits for solicitation at KBP are unlawfully anti-competitive.  *Id*. at

PageID.33-34.

Finally, Plaintiffs assert a state-law breach of contract claim, alleging that the City

failed to comply with obligations undertaken in the Agreement to resolve their 2021

lawsuit.  *Id*. at PageID.38.  Plaintiffs allege that the City agreed to promulgate rules

governing revocable permits and to adopt legislation amending its administrative rules

to relocate the nonprofit beachboy concession near the Duke Kahanamoku Statue, but

that it failed adequately to perform either contractual obligation.  Meanwhile, Plaintiffs

contend, the City has continued to issue revocable permits without public notice.  *Id*.

As relief, Plaintiffs seek declaratory and injunctive relief permitting them to

engage in beachboy activities at KBP, as well as relief related to the alleged breach of the

Agreement.  *Id*. at PageID.40-41.

2.  After Plaintiffs filed the Complaint on July 19, 2025, the City filed a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for

summary judgment under Federal Rule of Civil Procedure 56.  Dkt. No. 12; Dkt. No. 12-

1.  Plaintiffs opposed, Dkt. No. 19, and the City then filed a reply memorandum in

support of its motion, Dkt. No. 21.  The City seeks dismissal of all of Plaintiffs' claims on

multiple grounds, including that Plaintiffs' claims are time-barred and fail to state a

claim upon which relief can be granted.  Dkt. No. 12, at PageID.78.  In the alternative,

the City requests summary judgment, arguing that Plaintiffs' First Amendment and

antitrust claims are barred by the Agreement.  *Id.*

Plaintiffs, meanwhile, filed a motion for partial summary judgment in which

they contend that they should prevail, as a matter of law, in their contention that the

City has breached the Agreement by failing to take promised remedial measures.  Dkt.

No. 24.  The City opposed, Dkt. No. 26, and Plaintiffs filed a reply memorandum in

support of their motion, Dkt. No. 28.

The court held a hearing on the City's motion to dismiss and the parties' cross-

motions for summary judgment on December 18, 2025.  *See* Dkt. No. 32.  The court

commends all counsel for their effective oral advocacy at that hearing.

## **DISCUSSION**

The City has argued that Plaintiffs' First Amendment and antitrust claims should

be dismissed for a number of merits-related reasons, but its principal contention is that

those claims are barred by the parties' 2023 commitment to globally resolve their

dispute through the Agreement.  The City further argues that this court lacks

jurisdiction over Plaintiffs' claim for breach of that Agreement.  Plaintiffs, for their part,

contend that they should prevail, as a matter of law, on their breach claim.

11

A.    The First Amendment and Antitrust Claims

We begin with the question of whether the Agreement bars Plaintiffs' First

Amendment and antitrust claims.

Although the parties disagree about the proper interpretation of the Agreement,

they agree—as does the court—that Hawaiʻi state law controls. *See Jeff D. v. Andrus*, 899

F.2d 753, 759 (9th Cir. 1989). That law allows and even encourages the use of settlement

agreements. *See Sylvester v. Animal Emergency Clinic of Oahu*, 72 Hawaiʻi 560, 566, 825

P.2d 1053, 1056–57 (1992) (observing that a settlement agreement "not only brings

finality to the uncertainties of the parties, but is consistent with [the Hawaiʻi Supreme

Court's] policy to foster amicable, efficient, and inexpensive resolutions of disputes.").

And so under Hawaiʻi law, a settlement agreement is given its full intended effect—that

is, a "compromise or settlement agreement disposes of all issues the parties intended to

settle." *Id.* at 570, 825 P.2d at 1059.

To discern the parties' intentions, Hawaiʻi courts apply "principles of contract

law." *Exotics Hawaii-Kona, Inc. v. E.I. Du Pont De Nemours & Co.*, 116 Hawaiʻi 277, 288,

172 P. 3d. 1021, 1032 (2007). Those principles provide that "an agreement should be

construed as a whole and its meaning determined from the entire context and not from

any particular word, phrase or clause." *Public Access Trails Hawaiʻi v. Haleakala Ranch

Co.*, 153 Hawaiʻi 1, 26, 526 P.3d 526, 551 (2023) (cleaned up). And words and phrases

"should be interpreted according to their plain, ordinary, and accepted sense in common speech." *Id.*[1]

1.   In this case, the Agreement as a whole—as well as its terms understood in their ordinary, accepted sense—reflect the parties' intention to broadly and globally resolve the legal disputes between them.  The Agreement explicitly releases "all Claims, disputes, and obligations between them *arising from and related to* Plaintiffs' claims in the Lawsuit."  Dkt. No. 3, at PageID.48 (emphasis added).  It defines "Lawsuit" to include the claims asserted in both the original complaint and the First Amended Complaint, as well as all related pleadings filed in that action.  *Id.* at PageID.49.  And the "arising from and related to" language is unquestionably broad; in ordinary speech, language of that nature reflects an effort to resolve not only the specific legal claims brought in the "Lawsuit," but also any legal claims that either stem or are logically related to the same dispute between the parties.

That the Agreement's language reflects a broad intention to preclude future claims based on the same or similar facts—that it seeks to globally and definitively resolve the legal controversy surrounding those facts—also follows naturally from well-accepted legal conventions.  As the Ninth Circuit has recognized, "relating to" language

---

[1]      Hawaiʻi law allows a court to "consider evidence beyond the four corners of the contract" when the contract's terms are ambiguous, *id.*, but neither party here offers any extra-textual evidence or argues that there is any ambiguity in the Agreement that extra-textual evidence could help to resolve.

generally covers anything with a "logical or causal connection." *Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018).  The use of that language in the Agreement is legally significant, because it is well-established that a "settlement agreement may preclude a party from bringing a related claim in the future." *Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010).  Indeed, "the weight of authority holds that a federal court may release not only those claims alleged in the complaint, but also a claim based on the identical factual predicate as that underlying the claims" in a settled suit.  *Class Plaintiffs v. City of Seattle*, 955 F. 2d 1268, 1287–89 (9th Cir. 1992); *see also Hesse*, 598 F.3d at 590 (a federal district court may "properly release[] claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the settlement.").  So when, as here, parties use language releasing "all Claims, disputes, and obligations between them *arising from and related to* Plaintiffs' claims in the Lawsuit," Dkt. No. 3, at PageID.48 (emphasis added), they must be understood to release all claims and disputes that depend on the "same set of facts as the claims that gave rise to the settlement." *Hesse*, 598 F.3d at 590.

The breadth of the Agreement's intended preclusive effect is further underscored by its express definitions and release provisions.  The agreement defines "Claims" broadly to include:

> any and all allegations, claims, cross-claims, counterclaims, third-party claims (however denominated), demands, obligations, actions, causes of action, claims for relief, damages, injuries, losses, liabilities . . . of every kind and nature whatsoever, whether known or unknown . . . *which were*

14

*alleged or could have been alleged in the Lawsuit*, including, but not limited to, any and all claims for injunctive or declaratory relief.  However, "Claims" shall not include future claims and/or lawsuits based upon other solicitations issued or First Amendment claims arising on or after the effective date of this Agreement.

Dkt. No. 3, at PageID.49-50 (emphasis added).  By covering any claims that "were alleged or could have been alleged in the Lawsuit," the Agreement demonstrates an intention to globally and definitively resolve Plaintiffs' challenge to the City's use of revocable permits, the requirement of obtaining permission to operate a nonprofit concession at KBP, and the enforcement of the ordinances precluding fee-generating services there.  Any claim that "could have been alleged" to these City practices—even if Plaintiffs did not think to raise it at the time and, indeed, even if they were not aware that they could have raised it at the time—is therefore foreclosed.  And by covering even claims "for injunctive . . . relief," the parties signaled their intention to preclude claims or requests for relief on a going-forward basis—that is, the Agreement precludes even claims against *continuing* harms.  A claim is barred so long as it is based on the "same set of facts as the claims that gave rise to the settlement," *Hesse*, 598 F.3d at 590, even if those facts—or the harms flowing from those facts—have continued on past the settlement date.

To be sure, the Agreement includes a carve-out from the definition of "Claims" for "future claims or and/or lawsuits based upon other solicitations issued or First Amendment claims arising on or after the effective date of this Agreement."  Dkt. No. 3,

at PageID.50.  And Plaintiffs argue that this carve-out language allows them to press

their current claims—even if they merely allege that the City is continuing to cause

them the same harms alleged in their earlier suit—so long as the harms alleged in the

present suit chronologically post-date the execution of the Agreement.  *See* Dkt. No. 19,

at PageID.485.  But the meaning of this phrase must be "determined from the entire

context and not from any particular word, phrase or clause."  *Public Access Trails*

*Hawaiʻi,* 153 Hawaiʻi at 26, 526 P.3d at 551.  The "entire context" here is an Agreement

through which the parties sought to globally and definitively resolve the dispute

between them, including any requests for injunctive relief against allegedly continuing

harms.  Given that context, it would not be appropriate to construe the carve-out as

allowing Plaintiffs to bring the same claims they brought in their 2021 lawsuit so long as

the challenged conduct continued after the Agreement.  Interpreting the Agreement in

that manner would mean that, far from globally resolving the parties' dispute, it would

have resolved only the matter of monetary damages for past conduct—leaving all

continuing conduct fair game for new lawsuits.  That would be an incongruous way to

interpret an agreement that sought to broadly and globally settle claims for injunctive

relief.

      The more appropriate reading of the carve-out language, therefore, is that it

allows Plaintiffs to challenge new solicitations and bring new First Amendment claims

only if based on alleged harms of a kind that first arose after the Agreement was

16

executed.  So, for example, if the City were ever to violate Plaintiffs' First Amendment rights—or any rights—in a new way, Plaintiffs would be free to bring a lawsuit to challenge that conduct.  But the carve-out does not allow Plaintiffs to bring a new lawsuit claiming that the City is continuing to violate their First Amendment rights in the same way as it had done in the earlier lawsuit; Plaintiffs have bargained away their right to challenge conduct or harms they had previously challenged.

This interpretation of the carve-out sits comfortably not only with the broader context of the Agreement, but also with the carve-out's specific terms.  It preserves First Amendment claims that "ar[ose]" after the Agreement.  But only claims based on new forms of alleged harm could be fairly said to "aris[e]" after the date of the Agreement; any claim based on conduct or harms predating the Agreement necessarily arose before the Agreement, even if the conduct or harms continued thereafter.  Similarly, a lawsuit challenging a new solicitation would not be "based upon" the new solicitation, but rather upon preexisting conduct or harm which merely continued alongside new solicitations.  In short, the terms of the Agreement are best read as adopting the familiar rule that claims are barred if based on the "same set of facts as the claims that gave rise to the settlement." *Hesse*, 598 F.3d at 590.

2.   That leaves the question of whether the Agreement's broad terms cover Plaintiffs' First Amendment and antitrust claims.  The court concludes they do.

17

a.   Start with the First Amendment claims.  In the 2021 action, Plaintiffs challenged the City's regulation of beachboy activity at KPB through concessions, revocable permits, and enforcement of park and peddling ordinances.  *See* 21-cv-00500-DKW-KJM, Dkt. No. 1, at ¶¶ 35-36, 41, 44.  Plaintiffs alleged that the City's failure to issue a nonprofit beachboy solicitation, its reliance on revocable permits issued without promulgated administrative rules, and its enforcement of solicitation ordinances against Copp vested City officials with unfettered discretion and operated as an unconstitutional "prior restraint" on speech.  *Id*. at ¶¶ 22, 41, 46, 83–85, 88-90.  They further alleged that enforcement actions for "peddling without a permit" chilled their expressive and cultural activities at KBP.  *See id*.  Plaintiffs sought declaratory and injunctive relief invalidating the challenged ordinances and practices and compelling the City to permit Plaintiffs to engage in nonprofit beachboy activity at KBP.  *Id*. at ¶¶ 96–103.

The 2025 complaint essentially contends that the City continues to impose the same harms.  Plaintiffs again allege that the City regulates beachboy activity at KBP through concessions, revocable permits, and enforcement of solicitation ordinances.  *See* Dkt. No. 1, at PageID.10–15.  They again allege that the permitting regime lacks governing standards, gives officials excessive discretion, and chills expressive activity. *Id*. at PageID.12–14, 17.  The enforcement conduct cited in support of the 2025 claims— including citations issued to Copp for peddling without a permit in connection with

surfboard rentals, fundraising, or donation-based instruction—is materially

indistinguishable from the enforcement conduct alleged in the 2021 action.  *Compare id*.

at PageID.14–16, *with* 21-cv-00500-DKW-KJM, Dkt. No. 1 at ¶¶ 81–82.  Moreover, the

record reflects that Copp received multiple citations for "peddling without a permit" in

connection with beachboy activities at KPB, in 2019, 2023, and 2025; all but one of the

cited enforcement actions occurred before execution of the Agreement.  *Id*. at PageID.14-

16.  Those pre-settlement enforcement actions were expressly encompassed by

Plaintiffs' 2021 lawsuit and were released by the Agreement, Dkt. No. 3, at PageID.49-

50, and the 2025 citation is naturally understood as simply a continuation of the harm

the parties globally settled through the Agreement in 2023.

　　　b.　The same is true of Plaintiffs' antitrust claims.  To be sure, Plaintiffs did not

raise antitrust claims in the 2021 lawsuit.  But that omission is immaterial, given that the

Agreement covers not only claims that were brought, but also any claims that *could have*

*been* brought.  And, the court concludes, Plaintiffs' antitrust claims indeed could have

been brought in the earlier lawsuit.  Granted, the City's has made some changes to the

regulatory regime covering nonprofit concessions at KPB—indeed, it has made those

changes partly because of the Agreement.  The Agreement required the City, within

ninety days, to "submit a bill for introduction by the Honolulu City Council" proposing

amendments to the City's administrative rules, including changes to licensing language,

departmental oversight, the definition of a qualified nonprofit beachboy association,

and the location of the nonprofit beachboy concession near the Duke Kahanamoku

Statue, subject to the City's sole discretion and environmental considerations.  Dkt. No.

3, at PageID.50.  Although Plaintiffs contend that the City has not done everything it

agreed to do, there is no dispute that the City has made some changes.

But Plaintiffs' antitrust claims rest on the same factual predicate as Plaintiffs'

earlier challenges to the City's regulation of beachboy activity at KPB.  That is to say,

despite conceded changes to the regulatory framework, Plaintiffs' alleged *harms*—which

flow from their continued inability to secure a City permit to operate at KBP—are the

result of practices that existed before the 2021 lawsuit was settled.  As in the 2021

lawsuit, Plaintiffs here challenge the City's administration of nonprofit beachboy

concessions, its reliance on revocable permits in lieu of nonprofit solicitations, and its

enforcement of solicitation and peddling ordinances at KBP.

In the present action, Plaintiffs allege that this regulatory scheme has resulted in

a monopoly over commercial surfing instruction and the exclusion of nonprofit

beachboy operators from KPB.  *See* Dkt. No. 1, at PageID.16–17, 31, 33–34.  They

contend that the City's failure to issue nonprofit beachboy solicitations, its continued

reliance on revocable permits issued without public notice, and the designation of zones

requiring permits for commercial surfing instruction collectively operate to favor a

small number of entities and to foreclose meaningful participation by nonprofit

beachboys.  *Id*.  Plaintiffs point, for example, to the award of revocable permits to Dive

Oahu and Pacific Island Beachboys "without any established rules" for award or

appeal, *see* Dkt. No. 1, at PageID.20, as anticompetitive under federal antitrust law. *Id*.

at PageID.39-40.

Those allegations neatly track the same factual narrative that Plaintiffs were fully

able to advance in the 2021 litigation.  In that action, Plaintiffs alleged that the City had

"effectively shut Palekaiko and other nonprofit beachboys out of Kūhiō Beach Park" by

failing to issue solicitations for the nonprofit concession and by instead authorizing

beachboy activity through revocable permits issued without notice or governing

standards.  21-cv-00500-DKW-KJM, Dkt. No. 1, at ¶¶ 37, 77–80.  Plaintiffs further

alleged that this discretionary permitting framework favored a small number of

operators and excluded nonprofit beachboys from continuous operation at KBP.  *Id*. at

¶¶ 77–79.  These factual allegations—which Plaintiffs were able to raise in the 2021

lawsuit—would support the same antitrust claims they raise in their present lawsuit.

From this, it logically follows that Plaintiffs could have raised their antitrust claims in

the earlier suit, and those claims are therefore barred by the Agreement.  *See Reyn's*

*Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 749 (9th Cir. 2006) (holding that a

subsequent suit which "posit[ed] a different theory of anti-competitive conduct" was

barred because it was based on the same price-fixing predicate and injury as claims

settled in an earlier class action).

*     *     *

Plaintiffs' First Amendment claims are barred because they were released in the Agreement, and Plaintiffs' antitrust claims—though not pleaded in the 2021 action—were likewise released. The claims must, therefore, be dismissed. The only remaining question is whether they should be dismissed with or without prejudice.

Plaintiffs naturally ask that any dismissal be made without prejudice. Given the court's ruling that Plaintiffs' have surrendered their right to pursue these claims, there is precedent supporting the conclusion that Plaintiffs lack Article III standing. *See, e.g., Shaw v. Jar–Ramona Plaza, LLC*, No. 5:13-cv-01563, 2015 WL 1275294, at *6 (C.D. Cal. Mar. 16, 2015) ("[W]here a settlement agreement has released defendant 'from any liability for the claims in this action, no 'case or controversy' remains and this Court is without subject matter jurisdiction to reach the merits.' Indeed, logic suggests that the removal of a plaintiff's standing to sue is the precise purpose of a settlement agreement.") (citation omitted), *aff'd*, 673 F. App'x 774 (9th Cir. 2017).

Although that precedent is not controlling here, the City has not offered any persuasive reason to depart from it in this case. That is to say, while the City understandably expresses the preference that this court dismiss Plaintiffs' claims with prejudice, it has not articulated any basis for concluding that Plaintiffs would continue to have a concrete, personal stake in these claims despite the Agreement's bar. Because federal courts are courts of limited jurisdiction, the party seeking to invoke their

22

jurisdiction must establish that it exists; as to these settled claims, the City has not made

this showing.

Accordingly, the court GRANTS the City's motion for summary judgment

against Plaintiffs' First Amendment and antitrust claims—that is Plaintiffs' first, third,

and fourth causes of action—on the ground that Plaintiffs lack Article III standing to

pursue these claims. This constitutes a dismissal without prejudice, and Plaintiffs

therefore remain free to pursue these First Amendment and antitrust claims in state

court. And given the grant of the City's motion for summary judgment, the City's

motion to dismiss those same causes of action under Rule 12(b)(6) is DENIED as moot.

**B.    The Breach of Contract Claim**

All that remains is Plaintiffs' second cause of action: a state law claim for breach

of the Agreement. *See* Dkt. No. 1, at PageID.39. This breach-of-settlement claim is not

precluded by the Agreement; it could not have been brought prior to the execution of

the Agreement, as it concerns alleged nonperformance of that very document.

Plaintiffs move for summary judgment on this claim, contending they should

prevail as a matter of law in their argument that the City has breached the Agreement.

But before the court may consider the merits of this claim, it must assure itself that it

has subject matter jurisdiction over it. That is because "[f]ederal courts are courts of

limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994),

and have an "independent obligation to determine whether subject-matter jurisdiction

exists, even in the absence of a challenge from any party." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006).

In advance of the hearing on the pending motions, the court issued an entering order instructing the parties to be prepared to address jurisdiction at the hearing, *see* Dkt. No. 29; counsel for both parties did so effectively and the court thanks them for their effective advocacy.  Having carefully considered the parties' arguments, the court now turns to the question of whether it may exercise jurisdiction over this state law claim.

1.  As a threshold matter, it is clear that neither of the most typical forms of subject matter jurisdiction exists here:  the breach-of-settlement claim does not present a federal question under 28 U.S.C. § 1331 (because it is a state law claim), and diversity jurisdiction is not available under 28 U.S.C. § 1332 (because Palekaiko is a citizen of Hawaiʻi, Copp likely is as well, and the City is a municipality within Hawaiʻi).

Nor is supplemental jurisdiction available under 28 U.S.C. § 1367:  given that the court has determined that it lacks jurisdiction over the claims presenting federal questions (the First Amendment and antitrust claims), it cannot exercise supplemental jurisdiction over a state law claim.  *See Herman Fam. Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001).

2.  Federal courts may exercise ancillary jurisdiction to enforce their own orders. And, in this case, the Agreement contains the following language:

> The Parties agree that the forum for the resolution of any disputes concerning any aspect of this Agreement, including but not limited to the validity of this Agreement, the interpretation, enforcement, or construction of any of its terms, or any alleged breach of its provisions, shall be exclusively with the Court.

Dkt. No. 3, at PageID.52.  But this language in the parties' Agreement does not qualify

as an order that would authorize this court to exercise jurisdiction, and at the hearing,

the parties candidly acknowledged as much.

The court agrees with the parties' concession.  As the Supreme Court has

explained, ancillary jurisdiction to enforce a settlement agreement exists only if the

court either (1) incorporates the terms of the settlement agreement into an order, or (2)

expressly retains jurisdiction to enforce it.  *Kokkonen*, 511 U.S. at 381–82.  "The judge's

mere awareness and approval of the terms of the settlement agreement do not suffice"

for those terms to become part of the order.  *Id*. at 381.  Absent incorporation or

retention, "enforcement of the settlement agreement is for state courts."  *Id*. at 382.

Neither of these conditions is met here.

Following their settlement of the 2021 lawsuit, the parties submitted a joint

stipulation for dismissal under Federal Rule of Civil Procedure 41(A)(1)(a)(ii).  *See* 21-

cv-500-DKW-KJM, Dkt. No. 93.  But the stipulation does not incorporate the settlement

agreement.  The court's order adopting the stipulation did not do so either.  Nor does

the court's order otherwise represent that it seeks to preserve or retain the court's

jurisdiction.  *See* 21-cv-500-DKW-KJM, Dkt. No. 93.  To be sure, the court dismissed the

2021 based on the parties' stipulation.  But it is well-settled that even when a dismissal

is "based on" a settlement agreement, the district court does not retain jurisdiction

absent explicit incorporation.  *O'Connor v. Colvin,* 70 F.3d 530, 532 (9th Cir. 1995).

In any event, it is unclear whether the court would have retained jurisdiction

even if it had said as much in its dismissal order; the parties dismissed the prior action

under Rule 41(a)(1)(A)(ii), and a dismissal under this provision takes effect upon filing

and requires no action on the part of the court.  *See, e.g., Mannkind Corp. v. Miramar Pro.

Servs.*, 22-cv-1686-BAS-MSB, 2023 WL 3134598, at *1 (S.D. Cal. 2023) ("Dismissal is

effective upon the filing of a compliant notice or stipulation, as described in Rule

41(a)(1)(A)(ii), and no court order is required.").

And, finally, while the parties' settlement conferences reflect the parties'

preference that the court retain jurisdiction, they do not indicate the court's agreement

to retain jurisdiction over the matter once settled.  21-cv-500-DKW-KJM, Dkt. Nos. 90,

91.

For these reasons, the court agrees with the parties that it lacks ancillary

jurisdiction to adjudicate the parties' post-dismissal dispute over the alleged breach of

the Agreement.

3.  Plaintiffs argue that the court might still exercise jurisdiction over the breach-

of-settlement claim on the grounds that there is a sufficiently compelling federal interest

in this dispute.  It is true that the 2021 lawsuit was litigated in this court; that this court

took the parties settlement; and that the parties hoped to have this court resolve

disputes over compliance with the Agreement.  It is also true that this court might well

be the most convenient forum for litigating alleged breaches of the Agreement.  And

Plaintiffs are right that the Supreme Court has recognized "that in certain cases federal-

question jurisdiction will lie over state-law claims that implicate significant federal

interests."  *Grable & Sons Metal Prods., Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 312

(2005).

But this is an exceedingly narrow form of subject matter jurisdiction, available on

when a state law claim "turn[]s on substantial questions of federal law, and thus justify

resort to the experience, solicitude, and hope of uniformity that a federal forum offers

on federal issues."  *Id.*; *see also Newtok Village v. Patrick*, 21 F.4th 608, 617 (9th Cir. 2021).

Although Plaintiffs may present a persuasive argument for the convenience of the

federal forum—which explains why they stipulated in the Agreement that disputes

over the enforcement the Agreement should be litigated in federal court—they cannot

satisfy *Grable*'s test.  The breach-of-settlement claim is purely a question of state law and

does not require the resolution of any questions of federal law, let alone substantial

ones.  Accordingly, Plaintiffs have not shown that subject matter jurisdiction exists over

the breach-of-settlement claim.  Given the lack of federal jurisdiction, Plaintiffs must

press their breach-of-settlement claims in state court.

## <u>CONCLUSION</u>

For the foregoing reasons, the court holds that Plaintiffs' First Amendment and antitrust claims—the claims under their first, third, and fourth cause of action—are barred by the Agreement, and that Plaintiffs' therefore lack standing to pursue those claims. The court therefore GRANTS Defendant's motion for summary judgment as to those claims, though this dismissal is without prejudice. Defendant's motion to dismiss these same claims is DENIED as moot.

The court also holds that Plaintiffs' breach-of-settlement claim—their second cause of action—falls outside this court's subject matter jurisdiction, and for that reason DENIES Plaintiffs' motion for partial summary judgment and DISMISSES Plaintiffs' second cause of action without prejudice.

IT IS SO ORDERED.

DATED:  January 2, 2026, at Honolulu, Hawaiʻi.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Civil No. 25-00304 MWJS-RT, *Palekaiko Beachboys Club, Inc. v. City and County of Honolulu*; ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION TO DISMISS, DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND DISMISSING BREACH OF CONTRACT CLAIM FOR LACK OF SUBJECT MATTER JURISDICTION